FILED
COURT OF APPEALS
DIVISION II

2014 FEB 20 AM 9: 22

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Marriage of:<br><br>ALEXANDRA SWAKA,<br><br>                    Respondent,<br><br>    and<br><br>JAMES SWAKA,<br><br>                    Appellant. | No. 42758-3-II<br>Consolidated with No. 43518-7-II<br><br>PART PUBLISHED OPINION |

MAXA, J. – James Swaka appeals the trial court's decision to allow Alexandra Swaka to testify via Skype[1] from Spain at a relocation trial. We hold that the trial court did not abuse its discretion in allowing remote testimony under CR 43(a)(1) and therefore affirm on that issue. In the unpublished portion of this opinion, we address James Swaka's additional assignments of error and affirm on all issues except for the award of attorney fees relating to various pre-trial motions. We reverse and remand for further proceedings with regard to the attorney fee award.

---

[1] Skype is a live video chat and long-distance voice calling service. *See, e.g.*, *Fuqua v. Fuqua*, 57 So. 3d 534, 537 (La. Ct. App. 2011).

No. 42758-3-II, consolidated with No. 43518-7-II

FACTS

This appeal arises from ongoing litigation between former spouses James and Alexandra Swaka over Alexandra's[2] move to Spain with the parties' two children. James and Alexandra married in 2002, the couple separated in November 2006, and Alexandra filed for dissolution in March 2007. James did not respond or appear, and in September Alexandra obtained a default dissolution order, child support order, and parenting plan. Alexandra was designated as the primary residential parent.

In August 2009, Alexandra moved to Spain with the children for a study abroad program. James did not object to the relocation at that time. In June 2010, while still in Spain, Alexandra and the children began living with Juan Gonzalez and his two children, who were the same ages as the Swaka children. Alexandra eventually decided to remain in Spain permanently. In April 2011, Alexandra moved for an order permitting her to permanently relocate to Spain and for an order waiving notice requirements for relocation. The trial court granted the motions.

In June 2011, James moved for reconsideration of the trial court's order waiving notice requirements and he objected to the relocation. The trial court allowed Alexandra's relocation to Spain pending trial and issued a temporary order stating that the children would remain with Alexandra and that the original 2007 parenting plan would remain in full force and effect.

The relocation trial took place in March 2012. Alexandra moved for an order permitting her to testify via Skype at trial. In support of her motion, Alexandra argued that it would be inconvenient and disruptive to their children if she had to travel to Washington to testify. She also argued that she was worried that her parents might try to have her detained in Washington

---

[2] Because the parties share the same last name, we refer to them by their first names for clarity. We intend no disrespect.

2

"in order to get their hands on my kids." Clerks Papers (CP) at 650-51. Alexandra's concerns were based on her parents' previous efforts to force her to return to the United States with the children, including threatening to have her arrested and attempting to have her deported from Spain. The trial court granted the motion over James's objection. James appeals this decision.

## ANALYSIS

James argues that the trial court abused its discretion when it allowed Alexandra to testify via Skype under CR 43(a)(1).[3] We disagree because Alexandra showed good cause in compelling circumstances for testifying remotely.

A.    INTERPRETATION OF CR 43(a)(1)

CR 43(a)(1) provides:

> In all trials the testimony of witnesses shall be taken orally in open court, unless otherwise directed by the court or provided by rule or statute. For good cause in compelling circumstances and with appropriate safeguards, the court may permit testimony in open court by contemporaneous transmission from a different location.

The second sentence of CR 43(a)(1) was added in 2010 and was modeled after an identical provision in Federal Rule of Civil Procedure (FRCP) 43(a). WASHINGTON STATE REGISTER (WSR) 10-05-090 (2010).

The question here is whether the trial court properly found that there was "good cause in compelling circumstances" to allow Alexandra to testify via Skype. CR 43(a)(1). Because CR 43(a)(1) states that the trial court "may" permit remote contemporaneous testimony, the rule is

---

[3] Although James also assigns error to the trial court's order permitting Alexandra's witnesses to testify via Skype, he argues in his briefing only that the trial court should not have permitted Alexandra to testify via Skype. Accordingly, we consider only James's arguments regarding Alexandra's Skype testimony. RAP 10.3(a)(6); *Kadoranian v. Bellingham Police Dep't*, 119 Wn.2d 178, 191, 829 P.2d 1061 (1992), *overruled on other grounds by State v. Jimenez*, 128 Wn.2d 720, 911 P.2d 1337 (1996).

by its plain terms discretionary and we review the trial court's ruling on the issue for abuse of discretion. *See United States v. Kivanc*, 714 F.3d 782, 791 (4th Cir. 2013) (rulings regarding use of remote testimony under FRCP 43(a) reviewed for abuse of discretion), *cert. denied*, 134 S. Ct. 301 (2013). A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds or untenable reasons. *In re Marriage of Littlefield*, 133 Wn.2d 39, 46–47, 940 P.2d 1362 (1997).

No Washington court has interpreted the new language in CR 43(a)(1) allowing remote contemporaneous testimony. In *Kinsman v. Englander*, 140 Wn. App. 835, 843-44, 167 P.3d 622 (2007), we held that under the pre-2010 version of CR 43(a)(1) a trial court could not allow telephonic testimony without the consent of all parties. But *Kinsman* does not apply to the current version of the rule, which contemplates allowing remote testimony under certain circumstances.

The drafters of the 2010 amendment intended that Washington courts seek guidance from the 1996 Advisory Committee Note to FRCP 43 when interpreting this provision. WSR 10-05-090.

> The federal advisory committee note provides in relevant part:
>
> The importance of presenting live testimony in court cannot be forgotten. The very ceremony of trial and the presence of the factfinder may exert a powerful force for truthtelling. The opportunity to judge the demeanor of a witness face-to-face is accorded great value in our tradition. Transmission cannot be justified merely by showing that it is inconvenient for the witness to attend the trial.
> The most persuasive showings of good cause and compelling circumstances are likely to arise when a witness is unable to attend trial for unexpected reasons, such as accident or illness, but remains able to testify from a different place. Contemporaneous transmission may be better than an attempt to reschedule the trial, particularly if there is a risk that other – and perhaps more important – witnesses might not be available at a later time.
> Other possible justifications for remote transmission must be approached cautiously. . . . An unforeseen need for the testimony of a remote witness that

4

> arises during trial . . . may establish good cause and compelling circumstances. Justification is particularly likely if the need arises from the interjection of new issues during trial or from the unexpected inability to present testimony as planned from a different witness. . . .
>
> A party who could reasonably foresee the circumstances offered to justify transmission of testimony will have special difficulty in showing good cause and the compelling nature of the circumstances. . . .
>
> Safeguards must be adopted that ensure accurate identification of the witness and that protect against influence by persons present with the witness. Accurate transmission likewise must be assured.

FRCP 43 advisory committee's note to 1996 amendments.

Where a state rule has the same language as a federal rule, we may look for guidance to courts applying the federal rule. *Beal v. City of Seattle*, 134 Wn.2d 769, 777, 954 P.2d 237 (1998). In fact, the drafters of the amendment to CR 43(a)(1) also intended that Washington courts seek guidance from federal court interpretations of FRCP 43(a). WSR 10-05-090.

Federal appellate courts reviewing trial courts' rulings under FRCP 43(a) allowing remote contemporaneous testimony have been reluctant to reverse such rulings. *See, e.g., El-Hadad v. United Arab Emirates*, 496 F.3d 658, 669 (D.C. Cir. 2007) (trial court acted within its discretion when permitting plaintiff to testify via Internet video from Egypt when he had tried and failed to obtain visa to U.S.); *Thornton v. Snyder*, 428 F.3d 690, 698-99 (7th Cir. 2005) (affirming trial court's decision to allow trial by video conference due to plaintiff's incarceration and high escape risk and need for 20 additional witnesses to travel from different parts of the state); *Beltran-Tirado v. Immigration and Naturalization Serv.*, 213 F.3d 1179, 1186 (9th Cir. 2000) (decision to allow witness who lived in Missouri to testify telephonically at hearing in San Diego did not violate due process because remote testimony would have been admissible under FRCP 43(a)).

Federal appellate courts generally have affirmed trial court rulings *refusing* to allow remote testimony as well, deferring to the trial court's discretion. *See, e.g.*, *Kivanc*, 714 F.3d at 791 (trial court did not abuse discretion in denying motion for two claimants in a forfeiture action to testify from Turkey after weighing conflicting testimony regarding one claimant's ability to travel and because second claimant's reason for testifying remotely was that he was simply " 'unwilling to come back' " to the U.S.); *Air Turbine Tech., Inc. v. Atlas Copco AB*, 410 F.3d 701, 714 (11th Cir. 2005) (affirming trial court's denial of motion to use video conference testimony, noting that whether to allow video teleconference testimony was "a matter expressly reserved to the sound discretion of the trial court").

B.   GOOD CAUSE IN COMPELLING CIRCUMSTANCES

Determining whether a party has shown "good cause in compelling circumstances" involves a fact-specific inquiry that rests in the sound discretion of the trial court. We hold that under the circumstances here, the trial court did not abuse its discretion in allowing Alexandra to testify remotely from Spain.

First, traveling from Spain to Washington would have been a hardship for Alexandra and the children. In her declaration in support of her motion to testify via Skype, Alexandra stated, "I reside in Spain, and would have to travel internationally to appear at court in person. I would also have to either take my children out of school so that they could travel with me or place them in the care of others while I travelled." CP at 625. She also stated, "[I]t will not just be inconvenient for me to travel to Washington, but extremely difficult on my entire family. I play a vital role in the daily functioning of our family." CP at 650.

James notes that Alexandra did not allege that she was unable to travel, and argues that inconvenience is not a "compelling circumstance" because trial testimony is inconvenient for

most witnesses. And the 1996 advisory committee note to FRCP 43 states that remote testimony "cannot be justified merely by showing that it is inconvenient for the witness to attend the trial." However, the fact that travel would have disrupted the *children's* education and their lives shows actual hardship, not mere "inconvenience." Requiring Alexandra to travel to Washington to testify would have forced her to choose between uprooting the children and having them travel with her or leaving them in a foreign country in the care of a nonrelative.

Further, even if Alexandra's concerns can be characterized as inconvenience, significant inconvenience may be a factor that the trial court can consider in its discretion along with other factors in making the good cause determination. *Beltran-Tirado,* 213 F.3d at 1186 (the government had "reason to arrange" telephonic testimony because the witness lived in Missouri and the hearing was in San Diego); *Lopez v. NTI, LLC,* 748 F. Supp. 2d 471, 480 (D. Md. 2010) (the cost of international travel provided good cause for contemporaneous transmission of testimony when plaintiffs from Honduras made no more than $7,000 per year).

Second, James and Alexandra's son had a serious skin condition that was subject to aggravation by air travel. James himself expressed concern about this medical condition in a pre-trial pleading, stating that the condition "could be life-threatening." CP at 167. Again, if Alexandra was required to travel to Washington for trial she would have to choose between irritating her son's medical condition or leaving him in a foreign country with a nonrelative.

Third, Alexandra had a legitimate concern that her parents might try to interfere with her custody of the children if she traveled to Washington either alone or with the children. She stated in her declaration:

> [T]he Snellers have tried everything possible (including lying to the Spanish authorities that I falsified my visa) to get the kids and me back in Washington.

7

> Their desperation makes me very worried about what they might try to do to have me or Juan detained in Washington in order to get their hands on my kids.

CP at 650-51. The record reflects that Alexandra's parents previously had made threats against Alexandra to take legal action to get the children back to the United States, including having her arrested. The record also shows that Alexandra's parents had taken other steps against her, including having her visa revoked and attempting to have her and the children deported from Spain. Under the circumstances, it was appropriate for the trial court to consider this factor in assessing good cause under CR 43(a)(1).

Fourth, this case involves a bench trial. Video testimony is not the same as actual presence, and in certain cases the ability to observe a witness's demeanor might be affected. *See Thornton,* 428 F.3d at 697. However, a trial court may be better able than a jury to evaluate the testimony and assess the credibility of a witness testifying remotely.

We hold that under the specific circumstances presented in this case, the trial court did not abuse its discretion in finding "good cause in compelling circumstances" to justify remote contemporaneous testimony under CR 43(a)(1). And James does not argue that the trial court did not provide "appropriate safeguards" regarding the remote testimony as CR 43(a)(1) requires. Accordingly, we affirm the trial court's decision to grant Alexandra's motion to allow her to testify via Skype.

We consider James's remaining arguments in the unpublished portion of this opinion, and affirm on all issues except for the award of attorney fees to Alexandra. We reverse and remand on that issue only.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record in accordance with RCW 2.06.040, it is so ordered.

We now address James Swaka's remaining arguments. We hold that (1) the trial court did not abuse its discretion when it dismissed James's petition to modify the parenting plan for failure to show adequate cause because James failed to show changed circumstances justifying a major modification of the parenting plan; (2) the trial court did not abuse its discretion when it denied appointment of a guardian ad litem (GAL) because James failed to show how additional investigation into allegations of sexual abuse and his relationship with the children would have been helpful and because James did not present a way to have the GAL meet with the children in Spain; (3) the trial court failed to make any written findings regarding the award of attorney fees relating to James' motion to modify the parenting plan, and therefore the case must be remanded for reconsideration of that issue and entry of written findings, if appropriate; (4) substantial evidence supported most of the trial court's findings of fact in the relocation order and the unsupported findings do not warrant reversal of the trial court's visitation order; and (5) the trial court did not abuse its discretion when it limited James's visitation with the children and required that visits be supervised because the trial court's findings amply support its conclusions that James had abandoned the children and that he and the children did not have an emotional bond.

## ADDITIONAL FACTS

*Dissolution*

In September 2007, Alexandra obtained a default dissolution order, child support order, and parenting plan. At that time, the children were four years old and 15 months old. The trial

court concluded that James's visitation should be limited because he had a substance abuse problem. The parenting plan gave custody to Alexandra and allowed James to have supervised visitation for up to six hours per week or, if James moved out of state, one supervised visitation per month at the children's primary residence.

At the time the default orders were entered James had moved to Maine. In November 2007, James moved back to Washington and lived with Alexandra's parents, Sherry and Jeffrey[4] Sneller. During that time, the parties did not follow the parenting plan. James regularly watched the children at Alexandra's house while she was at the gym or at school and at the Snellers' house, sometimes unsupervised.

In May 2008, James moved back to Maine. At the time of the move, the children were four and one-half and two years old. James did not see the children between May 2008 and August 2009.

*Alexandra's Relocation to Spain*

In August 2009, Alexandra moved to Spain with the children for a study abroad program. Before the move Alexandra informed James and at first he did not oppose it. For the next several years, James had limited Internet contact with Alexandra and the children. Although Alexandra offered to set up times for the children to speak with James via Skype while in Spain, James did not contact Alexandra for the purpose of talking to the children. James also did not come to Spain to visit the children. Alexandra and the children returned to the United States in August and November of 2010, but she did not notify James of their return on either occasion.

---

[4] Because the Snellers share the same last name, we refer to them by their first names for clarity. We intend no disrespect.

10

Alexandra's parents disapproved of Alexandra's decision to remain in Spain with the children. Jeffrey sent e-mails to Alexandra and her fiancé threatening legal action if they did not comply with his demand that the children attend an international school in Spain or return to Washington to live with the Snellers.

*Objection to Relocation*

In May 2011, the trial court granted Alexandra's motion for an order permitting her to permanently relocate to Spain and for an order waiving notice requirements for relocation. In June 2011, James moved for reconsideration of the trial court's order waiving notice requirements, objected to the relocation, moved for a temporary restraining order preventing relocation, and filed a motion for contempt against Alexandra for failing to comply with the parenting plan's notice requirements. He asked the trial court to order that Alexandra return the children to Washington immediately and for Alexandra's parents to take temporary custody of the children pending an investigation by a GAL to investigate sexual abuse and medical neglect allegations made by Alexandra's parents and brother. He further proposed a parenting plan giving custody to him or a third-party custodian of his choosing, specifying Alexandra's parents, stating that the limitation on Alexandra's residential time was justified by concerns for physical, sexual, or emotional abuse of the children while living with her.

In declarations in support of James's motions, James, Sherry, and Jeffrey all expressed concerns regarding potential sexual contact between the children and Gonzalez and his children. They also expressed concerns about the children's health care. Sherry stated that the parties' son suffers from a chronic skin condition that was not being properly treated and that their daughter had had ring worm that Alexandra had refused to treat with appropriate medicine.

Regarding the sexual abuse, Sherry stated that the parties' daughter told her that she had been forced to expose herself to Alexandra's boyfriend, and she was forced to take baths with his two boys, that one of the boys had pulled her pants down in front of visiting guests. In her response, Alexandra explained the allegations of sexual abuse, stating that the children were playing at the beach one day and had taken a shower together, but that it had not happened since that date. She further explained that her boyfriend's sons were ages eight and five, almost the exact same ages as her children.

James also stated that he was concerned about the children living outside the United States because he did not have the means to travel outside the country to see them and because he had been unable to see the children when they returned to the United States because Alexandra failed to notify him when they returned. Alexandra responded that it was no more onerous for James to visit the children in Spain than it would have been for him to travel from Maine to visit them in Washington.

At the hearing on James's motions, James waived notice of relocation. As to his remaining claims, the trial court (1) allowed Alexandra's relocation to Spain pending trial, (2) issued a temporary order stating that the children would remain with the mother pending trial and that the original 2007 parenting plan would remain in full force and effect, (3) concluded that James had no standing to request that custody of the children go to their grandparents under chapters 26.09 and 26.10 RCW, found that the allegations of abuse were made in "hindsight", (5) found that all parties knew that Alexandra was in Spain with the children since 2009 and that litigation began two years later when Alexandra's parents wanted her to return to the United States, and (6) denied James's request for a GAL without prejudice. James did not seek reconsideration of these rulings and does not challenge them on appeal.

12

*Petition for Modification*

In September 2011, James petitioned for modification of the 2007 parenting plan. He claimed that there was a substantial change in circumstances because of the children's relocation to Spain to live with Alexandra's boyfriend and his children, James's relocation to Maine, Alexandra's failure to address the children's medical needs and allegations of sexual abuse, James's sobriety for the past two years, and Alexandra's denial of contact with the children since 2008. He also argued that the parenting plan was subject to modification because it was entered by default and therefore that a lesser showing of changed circumstances was required for modification. In support of the motion, James submitted the same evidence that was before the court for his previous motions objecting to the relocation.

James subsequently moved for an order finding adequate cause to proceed on his petition for modifying the parenting plan. He again asked the trial court to appoint a GAL to investigate and make recommendations for the new parenting plan and asked that the children be brought to Washington for observation by the GAL. He also moved for an order clarifying the trial court's temporary order leaving the original parenting plan in full force and effect because that plan required visits to be held in Washington when neither party lived there and because it did not set up any conditions on or requirements for Skype calls.

Alexandra responded that James's motion was duplicative of his motions three months earlier and that he was requesting the same relief. Therefore, she requested attorney fees "for having to go through this frivolous proceeding a second time." CP at 381. Alexandra also informed the court that since its decision on James's objection to relocation and entry of its temporary order, her parents had attempted to have her and the children deported from Spain and successfully persuaded the Spanish immigration authorities to deny their visas.

13

The trial court ruled that there was no adequate cause for a major modification of the parenting plan and that additional concerns regarding minor modifications would be addressed at the relocation hearing. The trial court declined to clarify its prior order, denied the motion to appoint a GAL, and granted Alexandra's request for attorney fees. The trial court subsequently set a trial date for the relocation trial.

*Relocation Trial*

At the time of the relocation trial in March 2012, James rescinded his objection to relocation and instead proposed a modified parenting plan. The proposed parenting plan provided that he would initially have six consecutive days of residential time with the children in Spain. The time then would progressively increase over time, resulting in three one-week blocks plus one six-week block per year of residential time and one weekend per month of visitation by 2014.

The trial court rejected James's parenting plan. The trial court's final parenting plan gave Alexandra full residential time with the children but permitted James to have supervised visitation in Spain for a minimum of one and one-half hours per day over a period of six consecutive days every three months. The trial court found that James's residential time with the children should be limited under RCW 26.09.191 because of "[w]illful abandonment that continue[d] for an extended period of time or substantial refusal to perform parenting functions" and that James's involvement with the children may have an adverse effect on the children's best interests because of "[t]he absence or substantial impairment of emotional ties between the father and children." CP at 709. The order allowed James to have e-mail contact with the children and Skype or telephone contact with the children once per week.

James appeals (1) the trial court's October 2011 order denying James's proposed modification of the parenting plan, denying appointment of a GAL, and denying clarification of its prior order; (2) the trial court's order of attorney fees to Alexandra; and (3) the trial court's modified parenting plan.

## ANALYSIS

### A.   No Adequate Cause for Modification

James argues that the trial court abused its discretion when it found that there was not adequate cause for a hearing on his motion for a major modification of the 2007 default parenting plan. We disagree.

#### 1.   Statutory Process for Modification

The court's primary concern in establishing parenting plans is the best interests of the children. RCW 26.09.002; *In re Marriage of Stern*, 57 Wn. App. 707, 712, 789 P.2d 807 (1990). The legislature has recognized that the child's best interests are normally served "when the existing pattern of interaction between a parent and child is altered only to the extent necessitated by the changed relationship of the parents or as required to protect the child from physical, mental, or emotional harm." RCW 26.09.002. Therefore, because changes in custody are viewed as "highly disruptive for the children," there is a "strong presumption in favor of custodial continuity and against modification." *Stern*, 57 Wn. App. at 712.

There is a two-step process for modifying a parenting plan. *In re Marriage of Zigler*, 154 Wn. App. 803, 809, 226 P.3d 202 (2010). First, RCW 26.09.270 provides:

> A party seeking a temporary custody order or a temporary parenting plan or modification of a custody decree or parenting plan shall submit together with his or her motion, an affidavit setting forth facts supporting the requested order or modification and shall give notice, together with a copy of his or her affidavit, to other parties to the proceedings, who may file opposing affidavits. The court

> shall deny the motion unless it finds that adequate cause for hearing the motion is established by the affidavits, in which case it shall set a date for hearing on an order to show cause why the requested order or modification should not be granted.

Under this statute, the party moving to modify a parenting plan must submit an affidavit showing "adequate cause" for modification. *Zigler*, 154 Wn. App. at 809. The trial court will allow a hearing on the motion only if the affidavit establishes adequate cause. RCW 26.09.270; *In re Custody of T.L.*, 165 Wn. App. 268, 275, 268 P.3d 963 (2011).

"The primary purpose of the threshold adequate cause requirement is to prevent movants from harassing nonmovants by obtaining a useless hearing." *In re Marriage of Adler*, 131 Wn. App. 717, 724, 129 P.3d 293 (2006). Adequate cause requires more than prima facie allegations that could support inferences that would establish grounds to modify the parenting plan. *Grieco v. Wilson*, 144 Wn. App. 865, 875, 184 P.3d 668 (2008), *aff'd sub nom. In re Custody of E.A.T.W.*, 168 Wn.2d 335, 227 P.3d 1284 (2010). At a minimum, adequate cause means evidence sufficient to support a finding on each fact the moving party must prove to modify the parenting plan. *In re Marriage of Lemke*, 120 Wn. App. 536, 540, 85 P.3d 966 (2004). The information supporting adequate cause should be something not considered in the original parenting plan. *Zigler*, 154 Wn. App. at 809.

Second, if the moving party establishes adequate cause and the court holds a full hearing, RCW 26.09.260(1) provides:

> Except as otherwise provided in subsections (4), (5), (6), (8), and (10) of this section, the court shall not modify a prior custody decree or a parenting plan unless it finds, upon the basis of facts that have arisen since the prior decree or plan or that were unknown to the court at the time of the prior decree or plan, that a substantial change has occurred in the circumstances of the child or the nonmoving party and that the modification is in the best interest of the child and is necessary to serve the best interests of the child.

Under this statute, the trial court may modify the existing parenting plan only if it finds based on new or previously unknown facts that there has been a substantial change in the circumstances of the child or the nonmoving party and that the modification is in the child's best interest and necessary to serve the best interests of the child. RCW 26.09.260(1); *Zigler*, 154 Wn. App. at 809; *George v. Helliar*, 62 Wn. App. 378, 382-83, 814 P.2d 238 (1991). The purpose of these procedures is to "protect stability by making it more difficult to challenge the status quo." *In re Parentage of C.M.F.*, ___ Wn.2d ___, 314 P.3d 1109, 1113 (2013).

Further, RCW 26.09.260(2) provides that the trial court must retain the residential schedule established in the original parenting plan except under four specific circumstances. One of those circumstances is a finding that "[t]he child's present environment is detrimental to the child's physical, mental, or emotional health and the harm likely to be caused by a change of environment is outweighed by the advantage of a change to the child." RCW 26.09.260(2)(c). "Failure by the trial court to make findings that reflect the application of each relevant factor is error." *Stern*, 57 Wn. App. at 711.

### 2. Exception for Default Parenting Plans

An exception to the requirement that a moving party show a substantial change in circumstances applies to parenting plans entered by default, for which no showing of changed circumstances is required. *In re Rankin*, 76 Wn.2d 533, 537, 458 P.2d 176 (1969). The court in *Rankin* reasoned that a trial court entering a custody order by default has not had the chance to observe opposing witnesses and the trial court is unable to properly exercise its discretion in weighing competing evidence in the best interests of the child. 76 Wn.2d at 536-37. Therefore, the court held that if a parenting plan is entered by default, the trial court may consider facts

17

existing at the time the original dissolution decree was entered and the moving party need not necessarily show changed circumstances.[5] *Rankin*, 76 Wn.2d at 538.

Relying on *Rankin*, James argues that because the parenting plan was entered by default, "a lesser showing of a change of circumstances" should have been required to satisfy the first step in the analysis for a parenting plan modification, adequate cause. Br. of Appellant at 18-19. James misreads *Rankin*. *Rankin* holds that in the context of default parenting plans, parties seeking modification may show additional facts existing at the time the parenting plan was entered to justify modification and are not limited to showing changed circumstances arising only after the initial parenting plan was entered. 76 Wn.2d at 537-38; *cf. In re Parentage of Jannot*, 110 Wn. App. 16, 25, 37 P.3d 1265 (2002) ("[T]he information considered in deciding whether a hearing is warranted should be something that was not considered in the original parenting plan."), *aff'd*, 149 Wn.2d 123, 65 P.3d 664 (2003). Therefore, when a court enters a default parenting plan, the party seeking to modify the plan may do so based on a showing of changed circumstances under RCW 26.09.260(1) or based on facts existing when the original parenting plan was entered that the trial court did not consider. *Rankin*, 76 Wn.2d at 537-38.

Here, James does not argue that the facts did not support entry of the original 2007 parenting plan. Rather, he bases his arguments entirely on changed circumstances. Accordingly,

---

[5] Alexandra argues that when the legislature enacted RCW 26.09.260, it eliminated *Rankin*'s rule for default orders because the statute includes no exception for default orders. She further notes that there must be no exception to following the rules in the statute because it is an abuse of discretion for the trial court to grant a motion to modify a parenting plan unless the motion complies with the requirements of RCW 26.09.260. *See In re Custody of Halls*, 126 Wn. App. 599, 606, 109 P.3d 15 (2005). However, "[a]bsent an indication that the Legislature intended to overrule the common law, new legislation will be presumed to be consistent with prior judicial decisions." *In re Marriage of Williams*, 115 Wn.2d 202, 208, 796 P.2d 421 (1990). Accordingly, we interpret RCW 26.09.260(1) consistently with the rule in *Rankin* that no showing of changed circumstances is required for default orders.

he was required to present affidavits containing sufficient evidence to support a finding that there has been a substantial change in circumstances and that modification is in the children's best interests. RCW 26.09.260(1); *Zigler*, 154 Wn. App. at 809.

### 3. No Adequate Cause

The trial court ruled that no hearing was required on James's petition to modify because he did not show adequate cause. We review a trial court's determination of adequate cause for a proposed parenting plan modification for abuse of discretion. *In re Parentage of Jannot*, 149 Wn.2d at 128. A trial court abuses its discretion when its decision is manifestly unreasonable, based on untenable grounds, or made for untenable reasons. *Littlefield*, 133 Wn.2d at 46–47.

James argues that the following facts arising after entry of the default parenting plan support modification for changed circumstances: (1) allegations regarding the children's sexual contact, (2) his relocation to Maine, (3) his sobriety, (4) his stable home life and employment, (5) the need to change transportation provisions, (6) the need to address the location of visits, and (7) the need to modify the supervision requirement.[6] We disagree.

First, the trial court noted that the case already was set for hearing on Alexandra's relocation and that this hearing could result in minor modifications to the parenting plan based on the relocation. Therefore, there was no adequate cause to modify the parenting plan before the relocation hearing based on the need to change transportation provisions or the need to address the location of visits.

---

[6] In his motion to modify the parenting plan, James also claimed that the following changed circumstances supported modification: (1) Alexandra's relocation to Spain, (2) Alexandra's new residence in the home of her boyfriend and his children, (3) Alexandra's failure to attend to the children's medical needs, and (4) Alexandra's interference with James's attempts to contact the children. However, because James does not raise these arguments on appeal, we do not address them.

Second, RCW 26.09.260(1) expressly states that the only relevant changes of circumstances are those involving the child or the nonmoving parent. Therefore, in addressing adequate cause the trial court cannot consider the moving party's changed circumstances. *George*, 62 Wn. App. at 383. Accordingly, James's relocation, sobriety and stable home life were not factors supporting a substantial change in circumstances. And because James's request to modify the requirement that his visits be supervised was based primarily on changes in his circumstances, there was no adequate cause to modify that requirement.

Finally, with regard to the sexual contact allegations, the trial court already had found in its previous order that these allegations were made in "hindsight". Report of Proceedings (RP) (June 24, 2011) at 36. The court noted that it was only after the litigation started that Alexandra's family made the allegations even though they were aware of the circumstances far earlier. And Alexandra stated in her declaration that the litigation began because she refused to return to the United States, contrary to her parents' wishes. We presume that the trial court weighed this evidence and found Alexandra's explanation for the allegations more credible. *Snyder v. Haynes*, 152 Wn. App. 774, 779, 217 P.3d 787 (2009). Accordingly, the trial could have reasonably concluded that these allegations were merely unsubstantiated allegations of abuse and were therefore insufficient to justify an evidentiary hearing. *Grieco*, 144 Wn. App. at 875.

James nevertheless argues that the trial court's adequate cause decision should be reversed because the trial court failed to make specific findings on the relevant criteria in RCW 26.09.260, relying on *In re Marriage of Shryock*, 76 Wn. App. 848, 852, 888 P.2d 750 (1995) and *Stern*, 57 Wn. App. at 711. But although *Shryock* and *Stern* both state the requirement for specific findings, both cases related to findings made after evidentiary hearings on modification,

20

not to adequate cause determinations. And James has submitted no authority that specific findings are required for an adequate cause determination.

We hold that the trial court did not abuse its discretion in finding no adequate cause to hold a hearing on James's petition to modify the parenting plan. Accordingly, we affirm the trial court's dismissal of James's modification petition.

B.   APPOINTMENT OF GAL

James argues that the trial court abused its discretion by denying his motion to appoint a GAL. We disagree.

RCW 26.09.220(1) authorizes a court, in considering parenting arrangements, to order an investigation and report or to appoint a GAL. The purpose of appointing a GAL is to ensure that the children's best interests are promoted through an independent investigation and recommendation. *In re Marriage of Waggener*, 13 Wn. App. 911, 917, 538 P.2d 845 (1975). We review the decision whether to appoint a GAL for abuse of discretion. *Vo v. Pham*, 81 Wn. App. 781, 784, 916 P.2d 462 (1996).

James made requests at two different times in this litigation to have a GAL appointed. First, he requested that the trial court appoint a GAL in his motion for reconsideration of the order waiving notice requirements, motion to show cause for contempt, and motion for a temporary order restraining relocation. The trial court denied the motion without prejudice, stating that the matter could be reconsidered if James could "figure out some way to do it in Spain." RP (June 24, 2011) at 37. Second, James requested a GAL appointment in conjunction with his motion for a finding of adequate cause and clarification of the trial court's temporary order. He asked the trial court for an order "requiring that the children be brought to Washington

for the GAL to interview them and observe how they interact with both parents." CP at 362. The trial court denied the motion.

James argues that the trial court should have granted his motions to have a GAL appointed because the GAL could have provided information regarding the allegations of sexual contact. But the trial court did not abuse its discretion in finding that the sexual contact allegations were made only after Alexandra decided to remain in Spain contrary to her parents' wishes. The trial court concluded that these allegations did not require the appointment of a GAL, particularly when there was no practical way for the GAL to have face to face contact with the children. Accordingly, we hold that the trial court did not abuse its discretion in declining to appoint a GAL on this basis.

James also argues that the GAL could have investigated the children's relationship with him and Alexandra's alleged interference with their communication. But Alexandra stated that as a result of James's absence from the children's lives, they do not know who he is. After James relocated to Maine, he did not see the children again for over four years. And as to their ability to communicate with him, Alexandra presented evidence of Skype calls James claimed that he missed. James fails to show how the trial court abused its discretion in ruling that no additional GAL investigation was warranted given this evidence.

Moreover, the trial court's original denial of James's motion for a GAL appointment stated that he could renew the motion if he could find a way to have the GAL in Spain. His renewed motion for appointment of a GAL requested that the children meet with a GAL in Washington, contrary to the trial court's direction. James stated that Alexandra's parents had agreed to fund the children's visit to Washington to meet with the GAL and that doing so would be more cost-effective than sending a GAL to Spain. However, the trial court reasonably could

have concluded that given the minimal utility of the proposed GAL investigation and the disruptiveness of returning the children to Washington, James's request for a GAL investigation requiring the children to fly to Washington was inappropriate. Accordingly, we hold that the trial court did not abuse its discretion when it denied James's second request for appointment of a GAL.

C.   ATTORNEY FEES FOR SUBSEQUENT MOTIONS

James argues that the trial court abused its discretion when it awarded attorney fees to Alexandra for responding to James's adequate cause motion, motion to clarify its temporary order, and motion to appoint a GAL because the trial court failed to make written findings as required by RCW 4.84.185. Because the trial court failed to enter any written findings or otherwise provide a record for our review, we remand for reconsideration of the issue and entry of findings, if appropriate.

We review a trial court's decision to grant or deny a statutory attorney fee award for abuse of discretion. *In re Marriage of Coy*, 160 Wn. App. 797, 807, 248 P.3d 1101 (2011). "[T]rial courts must exercise their discretion on articulable grounds, making an adequate record so the appellate court can review a fee award." *Just Dirt, Inc. v. Knight Excavating, Inc.*, 138 Wn. App. 409, 415, 157 P.3d 431 (2007). Therefore, "the trial court must enter findings of fact and conclusions of law to support an attorney fee award." *Just Dirt*, 138 Wn. App. at 415. "[A]bsence of an adequate record upon which to review a fee award will result in a remand of the award to the trial court to develop such a record." *Mahler v. Szucs*, 135 Wn.2d 398, 435, 957 P.2d 632 (1998), *overruled in part on other grounds by Matsyuk v. State Farm Fire & Cas. Co.*, 173 Wn.2d 643, 272 P.3d 802 (2012).

Alexandra requested fees under RCW 4.84.185, which allows a court to award attorney fees to the prevailing party in an action if the action as a whole was "frivolous and advanced without reasonable cause." *Bldg. Indus. Ass'n of Wash. v. McCarthy*, 152 Wn. App. 720, 745-46, 218 P.3d 196 (2009). RCW 4.84.185 expressly provides that in order to support an award under the statute, the trial court must enter written findings that the action is frivolous. *Havsy v. Flynn*, 88 Wn. App. 514, 521, 945 P.2d 221 (1997). A lawsuit is frivolous when it cannot be supported by any rational argument on the law or facts. *Curhan v. Chelan County*, 156 Wn. App. 30, 37, 230 P.3d 1083 (2010).

Here, the trial court failed to make any written findings supporting its fee award. Instead, the trial court's order awarding fees merely stated, "Attorney's fees will be awarded to the mother in an amount to be set at a future hearing or upon agreed order. The fee award is against the father." CP at 524. In its oral ruling, the trial court stated, "I am going to order attorney fees in this case. I don't think this motion for modification was brought on grounds that present issues of merit for the court to look at, and so I will grant an attorney fees award against [James]." RP (Nov. 7, 2011) at 22. The trial court's summary conclusion in its oral ruling that the petition for modification was meritless is insufficient for us to determine whether the trial court abused its discretion in awarding attorney fees under RCW 4.84.185.

Moreover, in order for fees to be awarded under RCW 4.84.185, the action *as a whole* must be frivolous. *McCarthy*, 152 Wn. App. at 745-46. Here, even after examining the trial court's oral ruling, it is only clear that the trial court thought that the petition for modification was frivolous. The record does not show whether the trial court also considered whether James's second request for a GAL and the motion to clarify the temporary order also were frivolous. Therefore, we remand with directions to reconsider the basis for the award under RCW 4.84.185

24

and to enter appropriate findings if the award is confirmed on that basis. *Mahler*, 135 Wn.2d at 435.

### D. TRIAL FINDINGS OF FACT

James challenges certain findings of fact the trial court entered after trial. He argues that because these findings are erroneous, they cannot support the trial court's modification of the parenting plan (discussed below). We hold that only two findings are erroneous and that those findings do not warrant reversal of the court's modification order.

We review challenges to the trial court's factual findings for substantial evidence. *In re Marriage of Fahey*, 164 Wn. App. 42, 55, 262 P.3d 128 (2011), *review denied*, 173 Wn.2d 1019 (2012). Substantial evidence exists if the record contains sufficient evidence to persuade a fair-minded, rational person of the finding's truth. *Fahey*, 164 Wn. App. at 55. The party challenging a finding bears the burden of showing that it is not supported by the record. *Standing Rock Homeowners Ass'n v. Misich*, 106 Wn. App. 231, 243, 23 P.3d 520 (2001). Unchallenged findings are verities on appeal, and challenged findings are also binding on appeal if they are supported by substantial evidence. *Robel v. Roundup Corp.*, 148 Wn.2d 35, 42, 59 P.3d 611 (2002); *Standing Rock*, 106 Wn. App. at 243.

Evidence may be substantial even if there are other reasonable interpretations of the evidence. *Sherrell v. Selfors*, 73 Wn. App. 596, 600–01, 871 P.2d 168 (1994). "We defer to the trial court's determinations on the persuasiveness of the evidence, witness credibility, and conflicting testimony." *Snyder*, 152 Wn. App. at 779. Therefore, we will not disturb a trial court's finding of fact if substantial, though conflicting, evidence supports the finding. *Merriman v. Cokeley*, 168 Wn.2d 627, 631, 230 P.3d 162 (2010).

1. No Contact with Children Since 2008

James challenges the trial court's findings regarding his contact with the children after he returned to Maine after living with Alexandra's parents in mid-2008. First, he challenges the finding that " '[t]he father has not seen the children since May 2008.' " Br. of Appellant at 14 (quoting CP at 719). But James testified at trial that he had not had in-person contact with the children since mid-2008, and Alexandra's parents confirmed this. Accordingly, the finding is supported by substantial evidence.

Second, James challenges the trial court's finding that " '[James] has not been in the children's lives for almost four years.' " Br. of Appellant at 14 (quoting CP at 728). In support of his challenge, James notes that he testified that he had regular telephone contact with the children after he left Washington in 2008 until the children left for Spain with Alexandra in 2009. He also says that Alexandra admitted this fact in her testimony. However, the portion of her testimony James cites states that he *missed* calls with the children in 2009, not that there was actual contact. And although according to his testimony, James may have had telephone contact with the children between 2008 and 2009, the trial court could have reasonably concluded that James's lack of in-person contact with the children and only limited telephone contact with them amounted to James having "not been in the children's lives." CP at 728. This is especially true in light of the trial court's unchallenged finding that in March 2010, "[James] admits that [his daughter] does not remember him now and [his son] does not know who he is." CP at 721. This finding is supported by substantial evidence.

2.    Unsupervised Contact with Children

James challenges the trial court's following findings relating to James's minimal unsupervised contact with the children:

> The children have never spen[t] unsupervised time with [James] after September 2007, or if they have, it was very brief.
> The father did not take the children for overnight trips or to do other things . . . in an unsupervised setting.

CP at 719.

He argues that there was "unrebutted evidence" that his contact with the children "was not actually supervised." Br. of Appellant at 14. The record supports James's contention that some of his contact with the children while he was living at the Snellers' home in Washington between November 2007 and May of 2008 was unsupervised. He watched the children at Alexandra's house while she was at the gym or at school three days a week for approximately one and one-half hours at a time and also at the Snellers' house, sometimes unsupervised. Four and one-half hours of unsupervised time per week for six months was more than "very brief." CP at 719. Accordingly, we hold that the finding is not supported by substantial evidence. However, there is no evidence that James took the children "for overnight trips" or that they did "other things" in an unsupervised setting, and therefore substantial evidence supports this finding.

3.    Skype Calls

James assigns error to the trial court's finding that in 2010 "there were two Skype visits [between James and the children] set up by [Sherry], but no testimony as to how those went." Br. of Appellant at 14 (quoting CP at 723). In support of this challenge, he points to his own

testimony and that of Sherry describing a 2010 Skype call with the children. Accordingly, this finding was not supported by substantial evidence.

### 4. E-mails with James's Daughter

James assigns error to the trial court's finding that exhibit 35, which consisted of "e-mails between [his daughter] and James over a period of two days," showed that his daughter "was the one that initiated the e-mails, and not the other way around." CP at 726. However, the e-mails in exhibit 35 support the trial court's finding. James nevertheless argues that the trial court ignored several e-mails James sent in 2009 to which his daughter did not respond and that the trial court ignored James's testimony regarding the e-mails. But because exhibit 35 supports the trial court's finding and we do not evaluate conflicting evidence, we reject James's argument. *Merriman*, 168 Wn.2d at 631; *Snyder*, 152 Wn. App. at 779.

### 5. Efforts To Contact Children

James challenges the trial court's findings that "[n]o attempts [we]re made by [James] to contact [Alexandra] to set up Skype or [p]hone contact" and "[f]rom March 2008 to March 2009 [James] ma[de] no attempt to contact the children by phone, card or other means." CP at 722. In support of his challenge to these findings, James points to the following evidence: (1) e-mails he sent to Sherry in 2010 and 2011, asking her to set up time with Alexandra for James to speak to the children; (2) an e-mail he wrote to Sherry in 2010 saying that he had talked to the children; and (3) an e-mail he sent to Alexandra in August 2009 stating that he had attempted to call her the previous day.

The e-mails were all dated after March 2009. Therefore, they do not contradict the finding that he made no attempt to contact the children between March 2008 and March 2009, and that finding is supported by substantial evidence. And apart from James's e-mail to

28

Alexandra, the evidence shows that James attempted to contact only Alexandra's family in order to set up time to talk to the children, not Alexandra herself. Therefore, the trial court's finding that he made no attempts to contact Alexandra directly is supported by substantial evidence.[7]

6. Effect of Erroneous Findings

We hold that the trial court's finding that James had no or very limited unsupervised time with the children after September 2007 and the finding that there was no testimony regarding the nature of two 2010 Skype calls are not supported by substantial evidence. However, even without these two findings the findings of fact were more than sufficient to support the trial court's rulings. James's unsupervised time with the children occurred between November 2007 and April or May of 2008, four years before the relocation trial. And James does not argue that what was actually said in the in two Skype calls was significant to the trial court's other findings.

E.     JAMES'S RESIDENTIAL TIME WITH CHILDREN

James argues that the trial court abused its discretion by imposing limitations on his residential time with the children to a minimum of 36 hours per year in Spain and by requiring that those visits be supervised. We disagree.

We first note that James rescinded his objection to relocation at trial and consequently does not appeal the trial court's decision permitting relocation. Rather, he challenges the modified parenting plan resulting from the relocation order.

We review rulings concerning parenting plans for abuse of discretion. *In re Marriage of Christel*, 101 Wn. App. 13, 20–21, 1 P.3d 600 (2000). Such rulings will seldom be changed

---

[7] James assigns error to a number of the trial court's other findings, but does not provide argument supporting these assignments of error in his brief. Accordingly, we decline to address them. RAP 10.3(a)(6).

upon appeal because the emotional and financial interests affected by such decisions are best served by finality. *See Jannot*, 149 Wn.2d at 127.

A trial court has authority to impose limitations on visitation in a parenting plan under RCW 26.09.191(2). Here, the trial court awarded Alexandra full residential time with the children except that James was permitted to have supervised visitation with the children in Spain for a minimum of one and one–half hours per day over a period of six consecutive days every three months. The trial court concluded that limitation on James's visitation was proper under RCW 26.09.191(2)(a) for "[w]illful abandonment that continues for an extended period of time or substantial refusal to perform parenting functions." CP at 720.

In support of this conclusion, the court made the following findings:

In a March 17, 2010 email [James] says he can . . . go to Spain to see the children, but there was absolutely no follow up to that or no plans made or no further inquiries about what time [Alexandra] might be [o]n Bainbridge Island.
Marc[h] 23, 2010 there is a series of [S]kype calls set up and in the email, [James] admits that [his daughter] does not remember him now and [his son] does not know who he is. . . .
. . . [T]he summer of 2010 goes by without further contact.

. . . .

No attempts are made by [James] to contact [Alexandra] to set up Skype or [p]hone contact even though [Alexandra] has offered as much. . . .
From March 2008 to March 2009 [James] makes no attempt to contact the children by phone, card or other means, and there was a failure on his part to maintain and build emotional ties where the children were involved. . . .
[James] was not maintaining contact with the children even though he had avenues to do so, and then made it exclusively through [Sherry]. . . .
[James]'s failure to maintain contact caused emotional harm to [his daughter]. . . .
These are formative years for the children, particularly for [the son], because . . . over half of his life he's not seen his father, and it is significant that there were opportunities . . . for [James] and he did not follow through on them.

. . . .

[James] was not trying to further his emotional bonds to his children, and he did nothing to nurture that relationship.

. . . .

It is astounding that [James] made no effort to see the children in Spain in December 2011, or any attempt to see the children in Spain during 2011 as trial

> was pending in this case. Court orders could have easily been fashioned and probably would have been agreed.
>
> . . . .
>
> Jeffery testified that he would pay for [James] to go to Spain, and [Alexandra] testified that she had made an offer to have [James] see the children in Spain during December 2011 but instead he came to Bainbridge Island to meet with his attorney and likely prepare for litigation.
>
> There has been willful abandonment by [James] of his relationship with his children . . . that continued for an extended period of time, and there have been minimal . . . attempts by [James] to maintain any type of relationship with his children.

CP at 721-24. These extensive findings clearly support the trial court's conclusion that James willfully abandoned his children and refused to perform parenting functions. Accordingly, we hold that the trial court did not abuse its discretion when it imposed limitations on James's visitation for this reason.

The trial court also concluded that residential time should be limited under RCW 26.09.191(2)(a) because of "[t]he absence or substantial impairment of emotional ties between the parent and the child." CP at 725 (boldface omitted). In support of this conclusion, the trial court made the following findings:

> [James] has not seen either child in person since his relocation to Maine in May 2008, nearly four years ago.
>
> . . . .
>
> For nearly half of [the son's] life he has not had physical contact with his father, and has had no cards or pictures. . . .
>
> [The daughter] has had one email session over two days with her father and that is the only contact she has had.
>
> . . . .
>
> It's clear that [James] hardly knows [his son].
>
> The contact between [James] and [his daughter] has been sporadic and has had no real substance to it.

CP at 725-28. Again, these findings amply support the trial court's finding that James and the children lacked any meaningful emotional ties and supported the limitations on James's visitation.

31

James nevertheless argues that because the trial court's order so significantly limits his time with the children, it was "not adequate to satisfy the basic purpose of the parenting act – fostering the relationship between parent and child." Br. of Appellant at 32. In support of his contention, James quotes the following portion of RCW 26.09.002, " 'The state recognizes the fundamental importance of the parent-child relationship to the welfare of the child, and that the relationship between the child and each parent should be fostered unless inconsistent with the child's best interests.' " Br. of Appellant at 32.

But fostering the parent-child relationship is not the only factor to be considered. RCW 26.09.002 further provides:

> The best interests of the child are served by a parenting arrangement that best maintains a child's emotional growth, health and stability, and physical care. Further, the best interest of the child is ordinarily served when the existing pattern of interaction between a parent and child is altered only to the extent necessitated by the changed relationship of the parents or as required to protect the child from physical, mental, or emotional harm.

Here, because the children did not have a relationship with their father at the time the parenting plan was modified, the trial court found that they needed to be protected from James because his behavior gave the children "little to believe that a trust relationship with their father could be put into place at this time." CP at 728. And because James had had no in-person contact with the children for four years, we hold that the trial court's limitation on his in-person time with them served the best interests of the children because it only minimally altered their existing pattern of interaction.

Moreover, although the parenting plan limits James's visitation, James did not exercise his visitation rights under the original parenting plan for the four years preceding trial.

Accordingly, if James were to follow through with the visitation set forth in the new parenting plan, he still would have more interaction with the children than before trial.

Finally, James argues that the trial court erred when it required that his visitation with the children be supervised. His only claim is that the trial court failed to enter findings supporting this ruling, citing *Shryock*, 76 Wn. App. at 852, and *Stern*, 57 Wn. App. at 711. But although both *Shryock* and *Stern* require findings supporting modification, neither case specifically discusses supervised visitation.

Further, the evidence supports the trial court's ruling on supervision. The trial court's extensive findings regarding the absence of a relationship between James and the children and his willful abandonment of them for four years supports the conclusion that it was not in the children's best interests to provide James with unsupervised visitation time.

We hold that the trial court did not abuse its discretion when it limited James's visitation time and required that the visitation be supervised.

We affirm on all issues except for the attorney fee award, for which we remand to the trial court to reconsider that award and make findings supporting its decision to award fees, if appropriate.

MAXA, J.

We concur:

JOHANSON, A.C.J.

BJORGEN, J.

33